704 A.2d 1032

CARE OF TENAFLY, INC., A NOT FOR PROFIT CORPORATION OF THE STATE OF NEW JERSEY, JANICE JACOBS AND GAYLE CHERTOFF, PLAINTIFFS–RESPONDENTS, v. THE TENAFLY ZONING BOARD OF ADJUSTMENT, DEFENDANT, AND THE MAYOR AND COUNCIL OF THE BOROUGH OF TENAFLY AND THE BOROUGH OF TENAFLY, DEFENDANTS–RESPONDENTS, AND THE GREAT ATLANTIC & PACIFIC TEA COMPANY, DEFENDANT–APPELLANT.

---

JAMES HIGGINS, JUDY ALDERSON, RICHARD D. LEVIN, JAMES J. VIRGONA, THOMAS J. PEROG, APRIL J. BRADLEY DELUSIO, DAVID STEINBERG, SHAKARJIAN REALTY CO., INC., MILTON HART, CONSTANTINE H. CADENAS, FRED A. SELSKY, CONSTANCE SELSKY, RUDOLPH BERNSTEIN, PEARL BERNSTEIN, ALBERT STONE, ELINORE STONE, HOWARD SACHAROFF, HOPE SACHAROFF, DORIS FRANKLIN, COMMITTEE FOR TENAFLY BUSINESSES, AN UNINCORPORATED ASSOCIATION, AND THE GRAND UNION COMPANY, PLAINTIFFS–RESPONDENTS, v. BOROUGH OF TENAFLY AND MAYOR AND COUNCIL OF THE BOROUGH OF TENAFLY, DEFENDANTS–RESPONDENTS, AND THE BOARD OF ADJUSTMENT OF THE BOROUGH OF TENAFLY, DEFENDANT, AND THE GREAT ATLANTIC & PACIFIC TEA COMPANY, DEFENDANT–APPELLANT.

---

CARE OF TENAFLY, INC., A NOT FOR PROFIT CORPORATION OF THE STATE OF NEW JERSEY, JANICE JACOBS AND GAYLE CHERTOFF, PLAINTIFFS–RESPONDENTS, v. THE TENAFLY ZONING BOARD OF ADJUSTMENT, DEFENDANT, AND THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., DEFENDANT–APPELLANT.

---

JAMES HIGGINS, JUDY ALDERSON, RICHARD D. LEVIN, JAMES J. VIRGONA, THOMAS J. PEROG, APRIL J. BRADLEY DELUSIO, DAVID STEINBERG, SHAKARJIAN REALTY CO., INC., MILTON HART, CONSTANTINE H. CADENAS, FRED A. SELSKY, CONSTANCE SELSKY, RUDOLPH BERNSTEIN, PEARL BERNSTEIN, ALBERT STONE, ELINORE STONE, HOWARD

SACHAROFF, HOPE SACHAROFF, DORIS FRANKLIN, COM-
MITTEE FOR TENAFLY BUSINESSES, AN UNINCORPORAT-
ED ASSOCIATION, THE GRAND UNION COMPANY, CAROLYN
J. SEWELL, CHARLES F. SEWELL, HERBERT LEVETOWN,
BERNICE LEVETOWN, ARTHUR BAUER, SUSAN BAUER, JO-
SEPH BIEGER, ELAINE BIEGER, WYCKOFF QUALITY BAK-
ERY TENAFLY, INC., RUDY FROEDER, AT RISK ENTER-
PRISES, INC., MANSOOR ARAIN, ROSALIND STEINBERG,
RONALD CITRO AND KETAN KENIA, PLAINTIFFS–RESPON-
DENTS, v. TENAFLY ZONING BOARD OF ADJUSTMENT, DE-
FENDANT, AND THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued November 3, 1997—Decided January 27, 1998.

364

Before Judges HAVEY, LANDAU and COLLESTER.

*Gail L. Price* and *Alfred L. Ferguson,* argued the cause for appellant (*Price, Meese, Shulman & D'Arminio* and *McCarter & English,* attorneys; *Ms. Price, Louis C. D'Arminio, Mr. Ferguson* and *Gary T. Hall,* of counsel and on the brief).

*Steven Morey Greenberg,* argued the cause for respondents Care of Tenafly, Inc., Janice Jacobs and Gayle Chertoff (*Greenberg & Lanz,* attorneys; *Mr. Greenberg* and *Susan S. Rutherford,* on the brief).

*Walter A. Lesnevich,* argued the cause for respondents Borough of Tenafly and Mayor and Council of the Borough of Tenafly (*Lesnevich & Marzano–Lesnevich,* attorneys; *Mr. Lesnevich,* on the brief).

*John J. Segreto,* argued the cause for respondents James Higgins, Judy Alderson, Richard D. Levin, James J. Virgona, Thomas J. Perog, April J. Bradley DeLusio, David Steinberg, Shakarjian Realty Co., Inc., Milton Hart, Constantine H. Cadenas, Fred A. Selsky, Constance Selsky, Rudolph Bernstein, Pearl Bernstein, Albert Stone, Elinore Stone, Howard Sacharoff, Hope Sacharoff, Doris Franklin, Committee for Tenafly Businesses, The Grand Union Company, Carolyn J. Sewell, Charles F. Sewell, Herbert

Levetown, Bernice Levetown, Arthur Bauer, Susan Bauer, Joseph Bieger, Elaine Bieger, Wyckoff Quality Bakery Tenafly, Inc., Rudy Froeder, At Risk Enterprises, Inc., Mansoor Arain, Rosalind Steinberg, Ronald Citro and Ketan Kenia (*Segreto & Segreto,* attorneys; *James V. Segreto,* of counsel and on the brief).

*George Milanos,* argued the cause for defendant Tenafly Zoning Board of Adjustment.

The opinion of the court was delivered by

HAVEY, P.J.A.D.

In this zoning case, defendant Great Atlantic and Pacific Tea Company, Inc. (A & P), appeals from a judgment declaring invalid a variance and site plan approval granted to it by defendant Tenafly Zoning Board of Adjustment (Board). Judge Hamer, in a comprehensive oral opinion, concluded that a member of the Board, whose mother owned a commercial enterprise approximately fifty feet from A & P's site, possessed a disqualifying conflict of interest which invalidated the approvals. We agree and affirm.

In November 1993, A & P applied to the Board for a special reasons variance and site plan approval to construct a supermarket with attached satellite stores on a 9.9 acre tract in Tenafly. The lot is zoned M–1, which permits uses such as light manufacturing, warehousing, office buildings and research laboratories. Since a retail supermarket is not a permitted use, a special reasons variance was required.

Prior to the first public hearing on November 22, 1993, the Board conducted a public "work session," at which Board member John Armaniaco disclosed that his mother owned commercial property on Piermont Road, approximately 50 feet from the northwesterly point of A & P's site. The Board's attorney advised Armaniaco that he was not in conflict of interest and could participate in the hearing. The remaining Board members concurred with the attorney's opinion. Neither A & P representa-

tives, nor representatives from any objectors, were present during the workshop.

During the subsequent eighteen public hearings, Grand Union Company and its employee, James Higgins, appeared in opposition to A & P's application. Neither opponent, nor any other interested party, raised the conflict of interest claim during the course of the hearings. At the close of the testimony, the Board conducted an executive session. During the session Armaniaco again raised the potential conflict of interest question and was again advised by the Board's attorney that no conflict existed. On October 10, 1994, the Board by written resolution, granted the special reasons variance by a five-to-two vote. Armaniaco voted in favor of the resolution.

Care of Tenafly, Inc. (Care), Grand Union and several Tenafly residents filed appeals to the Tenafly Borough Council. The Council affirmed the grant of the use variance by a three-to-three vote. *See N.J.S.A.* 40:55D–17e.

Subsequently, Care and others filed an action in lieu of prerogative writs challenging the special reasons variance. Grand Union and Higgins filed a separate action.

During the pendency of the in lieu actions, the Board approved A & P's final site plan application on May 15, 1995. Plaintiffs thereupon filed separate complaints challenging the site plan approval. In all of the prerogative writs complaints, plaintiffs raised the conflict of interest question respecting Armaniaco. The actions were consolidated, and Judge Hamer ordered that Armaniaco submit to a deposition on the conflict issue.

Armaniaco testified that he is in the business of operating heavy machinery. He owns several properties in Tenafly, as well as interests in limited liability corporations (LLCs) which also own property within the borough. His sister has a fifty percent interest in two of the LLCs.

Armaniaco's eighty-three-year-old mother is ninety-five percent owner of a third LLC, "125 Piermont Road, LLC." His sister owns

the remaining five percent. This LLC owns the commercial property referred to by Armaniaco during the workshop session which is fifty feet from A & P's site. Prior to A & P's variance application, 125 Piermont Road was leased to Rent–A–Wreck, a car rental business. While A & P's applications were pending before the Board, Rent–A–Wreck, a month-to-month tenant, requested a written lease. Armaniaco acknowledged that in the fall of 1994, he was consulted by his mother and sister as to whether they should enter into a written lease with Rent–A–Wreck. They also asked him his opinion regarding the proposed rental figure. He concurred in the idea of a written lease and told them "I thought that [the rental figure] was fair." According to Armaniaco, his mother and sister asked him about the lease "[b]ecause I am part of the family." Armaniaco also disclosed that his mother had no plans to sell the commercial property because she was using the rent as a source of income "to live on."

During the bench trial Judge Hamer considered the deposition testimony of Armaniaco, as well as the record made before the Board. He determined that Board member Armaniaco had an "absolute," "disqualifying" and "impermissible" conflict of interest which rendered the approvals voidable. The judge focused on the fact that Armaniaco's mother's commercial property was just fifty feet from the A & P site, and the variance and site plans, if granted by the Board "would have a financial impact on the property ... whether it be good, bad or whatever." The judge also considered Armaniaco's investment experience, his consultation with his mother and sister regarding the lease with Rent–A–Wreck, and the prospect that he may be a beneficiary under his mother's estate, in determining whether Armaniaco had a direct or indirect personal interest in the outcome of the applications before the Board. Finding that Armaniaco had acted in good faith and was "up front" in disclosing the potential conflict, the judge nevertheless concluded that the "potential" for psychological influence required his disqualification.

## I

A & P argues that the invalidation of its approvals "represents an unprecedented and wholly unwarranted misapplication of conflict of interest principles." In support of the contention, A & P cites to the following: (1) neither Armaniaco nor his mother had any interest in or relationship to A & P; (2) no evidence in the record exists demonstrating that an approval of A & P's applications would have an impact, positive or negative, on the mother's property; (3) Armaniaco's mother did not participate in the hearing before the Board; and (4) the judge's improper "speculative" observation that Armaniaco might inherit the property from his mother. A & P reasons that in view of these factors, Armaniaco's mother's interest in the nearby commercial property was too nebulous and remote a factor as to justify nullification of the approvals.

"At common law '[a] public official is disqualified from participating in judicial or quasi-judicial proceedings in which the official has a conflicting interest that may interfere with the impartial performance of his duties as a member of the public body.'" *Wyzykowski v. Rizas*, 132 *N.J.* 509, 523, 626 *A.*2d 406 (1993) (quoting *Scotch Plains–Fanwood Bd. of Educ. v. Syvertsen*, 251 *N.J.Super.* 566, 568, 598 *A.*2d 1232 (App.Div.1991)). The Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D–1 to –136, codified the common law principle. A zoning board member is prohibited from acting "on any matter in which he has, either directly or indirectly, any personal or financial interest." *N.J.S.A.* 40:55D–69.

The question of whether a specific "interest" is sufficient to disqualify is fact-sensitive, depending upon the special circumstances of each case. *Wyzykowski, supra,* 132 *N.J.* at 523, 626 *A.*2d 406; *Sugarman v. Township of Teaneck,* 272 *N.J.Super.* 162, 169, 639 *A.*2d 402 (App.Div.), *certif. denied,* 137 *N.J.* 310, 645 *A.*2d 139 (1994). In resolving the issue, the court must recognize the competing forces in play: the need to root out "corruption or favoritism" against the potential that disqualification based on

"some remote and nebulous interest" may "discourage capable men and women from holding public office." *Van Itallie v. Borough of Franklin Lakes*, 28 *N.J.* 258, 269, 146 *A.*2d 111 (1958).

■ Although a conflict of interest issue is resolved on a case-by-case basis, abundant decisions respecting specific fact patterns provide us guidance. " 'The question will always be whether the circumstances could reasonably be interpreted to show that they had the likely capacity to tempt the official to depart from his sworn public duty.' " *Wyzykowski, supra*, 132 *N.J.* at 523, 626 *A.*2d 406 (quoting *Van Itallie, supra*, 28 *N.J.* at 268, 146 *A.*2d 111). The Court in *Wyzykowski* distills the controlling principles as follows:

> Actual proof of dishonesty need not be shown. *Aldom, supra*, 42 *N.J.Super.* at 503, 127 *A.*2d 190. An actual conflict of interest is not the decisive factor, nor is "whether the public servant succumbs to the temptation," but rather whether there is a potential for conflict. *Griggs v. Borough of Princeton*, 33 *N.J.* 207, 219, 162 *A.*2d 862 (1960) (citing *Aldom, supra*, 42 *N.J.Super.* at 502, 127 *A.*2d 190). A conflicting interest arises when the public official has an interest not shared in common with the other members of the public. *Id.* 33 *N.J.* at 220–21, 162 *A.*2d 862. Another way of analyzing the issue is to understand that "[t]here cannot be a conflict of interest where there do not exist, realistically, contradictory desires tugging the official in opposite directions." *LaRue v. Township of East Brunswick*, 68 *N.J.Super.* 435, 448, 172 *A.*2d 691 (App.Div.1961).
>
> [*Wyzykowski, supra*, 132 *N.J.* at 524, 626 *A.*2d 406.]

*See* cases cited in *Wyzykowski, supra*, 132 *N.J.* at 524–25, 626 *A.*2d 406, applying these principles under varied circumstances. *See also* categories of situations requiring disqualification in Michael A. Pane, *Conflict of Interest: Sometimes a Confusing Maze, Part II, New Jersey Municipalities* at 8, 9 (1980).

Pertinent here is the inclusion within the conflict analysis of a provision under the Local Government Ethics Law, *N.J.S.A.* 40A:9–22.5d, which reads:

> No local government officer or employee shall act in his official capacity in any matter where he, *a member of his immediate family*, or a business organization in which he has an interest, has a direct or indirect financial or *personal involvement* that might reasonably be expected to impair his objectivity or independence of judgment[.]
>
> [Emphasis added.]

*See Wyzykowski, supra,* 132 *N.J.* at 530, 626 *A.*2d 406 ("[f]uture decisions [respecting conflicts of interest] should be consistent with the principles of [the Ethics Law]"). One commentator has observed that this provision, enacted in 1991 (L.1991, c. 29), by use of the words "personal involvement," is intended to broaden categories of disqualifying interests beyond the direct or indirect "personal or financial interest" standard utilized by the MLUL under *N.J.S.A.* 40:55D–69. William M. Cox, *New Jersey Zoning and Land Use Administration* § 3–1.2(e) at 38, 39 (Gann ed.1997). Cox notes that:

> In the past, for example, personal friendship has never been deemed to be a disqualifying factor. Under the wording of the Ethics Law, however, it would appear that such intangible relationships as friendship or being an alumnus of the same school as the applicant, for example, could be held to be grounds for disqualification.
>
> [*Id.* at 39.]

We need not attempt to define the outer limits of the term "personal involvement" here. Whether our inquiry is into the nature and duration of board member Armaniaco's "personal involvement" (*N.J.S.A.* 40A:9–22.5d), or his "direct[ ] or indirect[ ] ... personal ... interest," in A & P's application (*N.J.S.A.* 40:55D–69), the fundamental question remains constant: did the proximity of his mother's commercial property and his relationship with his mother have the capacity to impair his objectivity or independence of judgment and to "tempt [him] to depart from his sworn public duty"? *Van Itallie, supra,* 28 *N.J.* at 268, 146 *A.*2d 111.

Two Appellate Division cases have applied the common law principles to fact patterns analogous to the circumstances present here. In *Petrick v. Planning Board of Jersey City,* 287 *N.J.Super.* 325, 671 *A.*2d 140 (App.Div.1996), a planning board's site plan approval was challenged on the basis that a board member was in conflict by virtue of the fact that his wife was an employee of the applicant, Christ Hospital. *Id.* at 328, 671 *A.*2d 140. The board granted Christ Hospital's site plan approval for a parking garage. *Ibid.* We found no conflict of interest because the wife's employ-

ment with the hospital as an occupational therapist was "occasional." *Id.* at 331, 671 *A.*2d 140. We also observed that no evidence even suggested that the board member's wife's employment status "would be enhanced by the passage of the parking garage resolution" and further noted that the board member had in fact vigorously opposed the application and voted against approving the resolution. *Id.* at 332, 671 *A.*2d 140. We concluded that the relationship of the board member's wife with the hospital "is too remote and too attenuated to disqualify [the planning board member] from voting" on the hospital's application for site plan approval. *Ibid.*

In contrast, we held in *Barrett v. Union Tp. Comm.*, 230 *N.J.Super.* 195, 553 *A.*2d 62 (App.Div.1989), that a member of the governing body was in a position of potential conflict when he voted for an amendment to the township's zoning ordinance permitting the construction of a continuing health care community owned by a nursing home in which the Committee member's mother was a patient. *Id.* at 199, 204, 553 *A.*2d 62. We held that:

It would strain credulity to conclude that [the governing body member] did not have an interest in seeing that his invalid mother was properly cared for in the facility that was owned and operated by [the applicant]. The fact that this was not a direct personal or financial interest is not dispositive of the issue. The question is whether there existed an interest creating a potential conflict and not whether [the governing body member] yielded to the temptation of it.

[*Id.* at 204, 553 *A.*2d 62.]

We concluded that the "situation presented a potential for psychological influence that cannot be ignored." *Id.* at 204–05, 553 *A.*2d 62. *Accord Aldom v. Borough of Roseland,* 42 *N.J.Super.* 495, 507, 127 *A.*2d 190 (App.Div.1956).

■ In our view, the circumstances before us are more akin to the facts in *Barrett, supra,* 230 *N.J.Super.* 195, 553 *A.*2d 62, than those in *Petrick, supra,* 287 *N.J.Super.* 325, 671 *A.*2d 140. Board member Armaniaco's eighty-three-year-old mother owned a commercial enterprise within fifty feet of the A & P site. She therefore had sufficient interest in A & P's proposal before the planning board so as to receive written notice of its application.

See *N.J.S.A.* 40:55D–12b; *McNamara v. Borough of Saddle River,* 64 *N.J.Super.* 426, 430, 166 *A.*2d 391 (App.Div.1960) (the Legislature, by requiring that owners of any property within 200 feet of the property subject to the application be given written notice, declared that all such persons have an "interest" in the application).

 Moreover, as a general proposition, a public official "should not participate in a municipal matter ... where he might be reasonably expected to favor or promote a relative's interest of a substantial character." *Van Itallie, supra,* 28 *N.J.* at 268, 146 *A.*2d 111. Armaniaco's interest in an application involving a supermarket/shopping center directly across from his mother's commercial property cannot seriously be questioned. He acknowledged that his mother depended on the income derived from her commercial enterprise "to live on." The value of his mother's property, and consequently the income generated therefrom, would no doubt be affected by the Board's decision to grant A & P's special reasons and site plan applications. Clearly, this circumstance was not one that Armaniaco held "in common with members of the public." *Aldom, supra,* 42 *N.J.Super.* at 507, 127 *A.*2d 190. This "potential for psychological influences cannot be ignored." *Township of Lafayette v. Board of Chosen Freeholders,* 208 *N.J.Super.* 468, 473, 506 *A.*2d 359 (App.Div.1986).

Armaniaco's expressed interest in the financial integrity of his mother's commercial property was hardly "remote and nebulous." *Van Itallie, supra,* 28 *N.J.* at 269, 146 *A.*2d 111. He gave his mother advice about the fairness of the proposed rental amount and the wisdom of entering into a written lease with Rent–A–Wreck. This fact underscored Armaniaco's personal interest in looking after the financial health of his mother. Further, since the advice was given during the pendency of A & P's application, his personal interest could reasonably be interpreted as having the capacity to tempt him "to depart from his sworn public duty." *Id.* at 268, 146 *A.*2d 111. In short, his continued participation in the application process was incompatible with "the spirit of impartiali-

ty with which the Board's quasi-judicial proceedings must be governed." *Szoke v. Zoning Board of Adjustment,* 260 *N.J.Super.* 341, 345, 616 *A.*2d 942 (App.Div.1992).

## II

A & P argues that because the conflict claim is "tenuous at best," the equities in its favor weigh against the harsh remedy of nullifying the approvals. In particular, A & P notes that: (1) it was not made aware of the alleged conflict of interest or the Board counsel's opinion until after the eighteen days of hearings on its variance application were completed and the approval was granted;[1] (2) Grand Union and the other objectors did not assert the conflict issue before the Board; (3) the issue was raised for the first time by Care in its appeal to the governing body; and (4) A & P's good faith expenditure in excess of $1.2 million in approval costs was nullified by the trial court based on circumstances beyond the knowledge or control of A & P. A & P reasons that since the conflict of interest issue was a close one, these factors dictate affirmance of the approvals.

We know of no authority for the proposition that a conflict of interest may be ignored because of equitable factors favoring an applicant. *Sugarman, supra,* 272 *N.J.Super.* 162, 639 *A.*2d 402, cited by A & P, does not so hold. In *Sugarman,* a zoning board member was a prior affiliate member of the congregation which was applying to the board for variances to expand its synagogue. *Id.* at 166, 639 *A.*2d 402. During the hearing, plaintiffs-objectors, through their attorney, asked the board member about her prior affiliation with the congregation, but made no objection or motion

---

[1] There is no indication in the record before us that A & P's representatives and attorney were aware of Armaniaco's potential conflict of interest during the hearings on A & P's variance application. However, during the hearing on its site plan application, the objectors' attorney squarely raised the conflict issue. The Board's attorney advised the Board that he had already ruled that Armaniaco had no disqualifying interest. A & P's attorney, who was present, did not address the issue.

for the board member's recusal. *Id.* at 167, 639 *A*.2d 402. The purported conflict issue was raised for the first time in the Law Division. *Id.* at 168, 639 *A*.2d 402. We observed that:

where a Board member has such a tenuous appearance of impropriety as in this case, a party cannot make a strategic decision to not challenge the alleged impropriety at the hearing in order to save it as a trump card on appeal, in the event of an adverse decision. Hence, we decline to overturn the Board's decision on that basis.

[*Id.* at 171, 639 *A*.2d 402.]

First, it cannot be said here that plaintiffs made a "strategic decision" to save the conflict issue "as a trump card on appeal." As we understand the record, they were not present at the workshop session when Armaniaco disclosed his potential conflict. Thus, plaintiffs were in no better position than A & P to know of his disqualifying interest.

Second, the above-cited observation made by the *Sugarman* court is dictum. The holding in *Sugarman* was that, although the board member's prior affiliation with the congregation "suggests the advisability" of removing herself from the application process "due to a possible appearance of impropriety," there was no reason to vacate the board's grant of the variances because "[t]here was no indication of any actual pecuniary or personal interest, improper motive or actual bias" on the board member's part. *Ibid.* Thus, there was no conflict of interest. *Ibid.*

■ We also reject A & P's argument that the doctrine of equitable estoppel must apply to nullify the disqualifying interest as a basis to invalidate the approval. Its estoppel argument is based on the fact that it had no knowledge of the conflict during the Board hearings and, in good faith, expended $1.2 million in processing its application.[2] In support of that assertion A & P

---

[2] The substantial investment of time and expense by A & P could have been avoided had the Board given notice to A & P and the public at large of Armaniaco's disclosure at the first formal public hearing on the application. At that point, A & P or any objector could have explored Armaniaco's disclosure in order to judge " 'whether a particular interest is sufficient to disqualify' or is too 'remote and speculative.' " *McVoy v. Board of Adjustment of Montclair Tp.,* 213

relies on *Jesse A. Howland & Sons, Inc. v. Borough of Freehold,* 143 *N.J.Super.* 484, 363 *A.*2d 913 (App.Div.), *certif. denied,* 72 *N.J.* 466, 371 *A.*2d 70 (1976) and *Hill v. Board of Adjustment of Eatontown,* 122 *N.J.Super.* 156, 299 *A.*2d 737 (App.Div.1972). Citing *Jantausch v. Borough of Verona,* 41 *N.J.Super.* 89, 94–95, 124 *A.*2d 14 (Law Div.1956), *aff'd,* 24 *N.J.* 326, 131 *A.*2d 881 (1957), both *Howland* and *Hill* distinguish between a building permit issued without any semblance of compliance with or authorization in the ordinance (the "void" class), *Hill, supra,* 122 *N.J.Super.* at 166, 299 *A.*2d 737, and the permit issued as a result of an erroneous and debatable interpretation of the ordinance, relied on by the property owner in good faith (the "voidable" class). *Ibid.; see also Jantausch, supra,* 41 *N.J.Super.* at 94, 124 *A.*2d 14.

Neither *Howland* nor *Hill* are directly on point since they dealt with reliance on a building permit issued by a municipal official, not the conflict of interest of a zoning board member. Nevertheless, the "void" or "voidable" distinction cannot be ignored. Some courts hold that a disqualifying interest held by a board member renders the approval "void." *See Dover Tp. Homeowners & Tenants Ass'n v. Township of Dover,* 114 *N.J.Super.* 270, 279, 276 *A.*2d 156 (App.Div.1971) (the doctrines of laches, estoppel and relative hardship are inapplicable when the actions of a planning board are "void" in part because of a board member's conflict of interest). Other courts conclude that such approvals are "voidable." *See Pyatt v. Mayor of Dunellen,* 9 *N.J.* 548, 557, 89 *A.*2d 1 (1952); *Sugarman, supra,* 272 *N.J.Super.* at 169, 639 *A.*2d 402. In other contexts, the distinction is deemed significant, in that the equitable doctrines of ratification and estoppel may apply to "voidable" acts of a public body. *See Summer Cottagers' Ass'n of*

---

*N.J.Super.* 109, 113, 516 A.2d 634 (App.Div.1986) (quoting *Van Itallie, supra,* 28 *N.J.* at 268–69, 146 A.2d 111). A & P or the objector then could have moved for recusal of Armaniaco. *See* 35 *New Jersey Practice, Local Government Law* § 351 at 54–55 (Michael A. Pane) (2d ed.1993) (prompt and "full public disclosure" of a potential conflict of interest "allows an attorney for an applicant or objector to agree or disagree as to whether the member is in conflict").

*Cape May v. City of Cape May,* 19 *N.J.* 493, 504, 117 *A.*2d 585 (1955).

However, A & P has cited no case holding that the doctrine of equitable estoppel may apply where an approval is "voidable" because of a conflict of interest. We need not decide here whether there may be some set of facts justifying application of the doctrine in such circumstances. Suffice it to say that, on the facts here, where violation of the conflict of interest statute is clear, and where the objectors filed a timely challenge to the approvals, *see R.* 4:69–6(b)(3), the doctrine should not apply.

■ We reach this conclusion because of our uncompromising concern "for the impartial exercise of quasi-judicial authority." *McVoy, supra,* 213 *N.J.Super.* at 116, 516 *A.*2d 634. Indeed, we have held that a disqualification cannot even be waived by the appellant or an objector "where the conflict is immediate and real." *Id.* at 113, 516 *A.*2d 634. *See also* William M. Cox, *supra, New Jersey Zoning and Land Use Administration* § 3–3 at 47 ("[w]hat is certain is that if the interest is one which is specifically proscribed by statute, then the disqualification is absolute and there can be no waiver by anyone of the disqualification"). "If a personal interest requiring disqualification exists, neither the failure to object nor the existence of sufficient votes absent that member's vote would change the requirement that the entire proceeding would be voidable." *Sugarman, supra,* 272 *N.J.Super.* at 169, 639 *A.*2d 402. " 'The infection of the concurrence of the interested person spreads, so that the action of the whole body is voidable.' " *Pyatt, supra,* 9 *N.J.* at 557, 89 *A.*2d 1 (quoting *State, West Jersey Traction Co. v. Board of Pub. Works,* 56 *N.J.L.* 431, 440, 29 *A.* 163 (Sup.Ct.1894), *aff'd,* 57 *N.J.L.* 710, 34 *A.* 1134 (E. & A. 1895)). This is so because "[w]hen a member of a local agency exercises that broad discretion under the cloud of a conflicting personal interest, there is a greater public good to be served than holding an applicant or objector to his waiver." *McVoy, supra,* 213 *N.J.Super.* at 114, 516 *A.*2d 634.

The same is true when we consider A & P's purported faultlessness. Protecting the public interest in the integrity of the quasi-judicial process is the key. Applying estoppel when the objectors have made a timely challenge to the approvals diminishes that protection. The purpose of the conflict of interest statute is "prophylaxis against misconduct and its effect can be exerted fully only if it is applied undiscriminatingly where applicable." *Zell v. Borough of Roseland,* 42 *N.J.Super.* 75, 82, 125 *A.*2d 890 (App.Div. 1956).

Affirmed.